UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HENRY FERREYRA, JEFFERSON DENIZARD,
ANGEL PERDOMO PERDOMO, ROLANDO
OSHANE VILLIERS, REMIGIO TAPIA VILCHIS

                                    Petitioners,

                    -against-

THOMAS DECKER, in his official capacity as Director
of the New York Field Office of U.S. Immigration and
Customs Enforcement; and CHAD WOLF, in his official
capacity as Acting Secretary, U.S. Department of
Homeland Security,

                                    Respondents.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/27/2020___

20 Civ. 3170 (AT)

**<u>ORDER</u>**

ANALISA TORRES, District Judge:

Petitioners Henry Ferreyra, Jefferson Denizard, Angel Perdomo Perdomo, and Rolando

Oshane Villiers are currently detained by Immigration and Customs Enforcement ("ICE") in

county jails where cases of COVID-19 have been identified.[1]  Petition ¶¶ 6–9, ECF No. 1.

Petitioners filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241, requesting release

from ICE custody because of the public health crisis posed by COVID-19.  *See id.*

On April 23, 2020, Petitioners moved for a temporary restraining order ("TRO")[2]

requiring Respondents—Thomas Decker, as Director of the New York Field Office of ICE and

Chad Wolf, as Acting Secretary of the U.S. Department of Homeland Security—to (1)

immediately release Petitioners from detention, subject to reasonable conditions, and (2) refrain

from arresting Petitioners during the pendency of their immigration proceedings, in light of the

public health crisis posed by COVID-19.  *See* TRO Mot. at 1–2, ECF No. 4.

---

[1]  The Petition included a fifth Petitioner, Remigio Tapia Vilchis.  TRO Mot. 1 n.1.  Respondents agreed to release Vilchis prior to the filing of the motion for a TRO.  *Id.*  Accordingly, in this order "Petitioners" refers only to the four applicants for a TRO.

[2]  Petitioners filed their motion for a TRO and memorandum in support in a single ECF document.  To avoid confusion, the Court will cite to pages in the motion itself as "TRO Mot.," and to pages in the supporting memorandum of law as "TRO Mem."

For the reasons stated below, the TRO is GRANTED as follows: (1) Respondents and the Bergen, Essex, and Orange County Correctional Facilities are ORDERED to release Petitioners upon satisfaction of conditions to be imposed by the Court, and (2) Respondents are RESTRAINED from arresting Petitioners for civil immigration detention purposes until further order of the Court.

## BACKGROUND

Petitioners were detained by ICE in connection with removal proceedings. *See* Petition ¶ 18. They are housed in two New Jersey and one New York county jails where either detainees or staff have tested positive for COVID-19. Petition ¶ 2; TRO Mem. at 1. Specifically, Ferreyra and Villiers are detained at the Bergen County Correctional Facility ("Bergen County Jail"). Petition ¶¶ 6, 9. Perdomo Perdomo is detained at the Essex County Correctional Facility ("Essex County Jail"). *Id.* ¶ 8. And Denizard is detained at the Orange County Correctional Facility ("Orange County Jail"). *Id.* ¶ 7. Ferreyra, Perdomo Perdomo, and Villiers were detained in connection with removal proceedings pending at the Varick Street Immigration Court. *Id.* ¶¶ 6, 8, 9.

Each Petitioner suffers from chronic medical conditions, and faces an imminent risk of serious injury or death if exposed to COVID-19. Ferreyra, who has smoked for almost four decades, is 53 years old, and suffers from asthma, emphysema, and diabetes. *Id.* ¶ 6. Additionally, he has been diagnosed with severe psychiatric conditions, including schizophrenia, chronic post-traumatic stress disorder ("PTSD"), major depressive disorder, episodic paroxysmal anxiety, and anxiety disorder. *Id.* Denizard, age 27 and a daily smoker, has diminished lung capacity, shortness of breath during any type of physical activity, and a compromised immune system; he also suffers from severe chronic pain. *Id.* ¶ 7. At 50, Perdomo Perdomo is a long-

2

time smoker and suffers from deformities of the nose, inflammation of the lungs, problems with his prostate gland, and possible cirrhosis of the liver. *Id.* ¶ 8.  In 2017, he was hit by a vehicle and had to undergo brain surgery to alleviate swelling. As a result, Perdomo Perdomo has "extremely low cognitive functioning," which makes conforming with social distancing and other preventive measures challenging. *Id.*  Villiers is 24 and suffers from asthma. *Id.* ¶ 9.  He was initially detained at the Essex County Jail and then transferred to the Bergen County Jail, where he is currently housed. *Id.*  Though he was previously prescribed an inhaler, it was taken from him at the Bergen County Jail, and he is now experiencing shortness of breath. *Id.*

At 2:00 p.m. on April 24, 2020, the Court held a telephonic hearing on Petitioners' request for a TRO.  The Court now addresses, in turn, the issues of severance, venue, and Petitioners' request for a TRO.

## DISCUSSION

I.    Severance

Respondents argue that the petition should be severed into separate habeas actions.  Resp. Opp. at 16–19, ECF No. 7.  The Court disagrees.

First, severance is inappropriate given the equities and the time the Court has already devoted to considering the parties' submissions.  *See Valenzuela Arias v. Decker*, No. 20 Civ. 2802, 2020 WL 1847986, at *2–3 (S.D.N.Y. Apr. 10, 2020) (denying respondents' motion to sever at the TRO stage to conserve judicial economy, among other considerations); *Coronel v. Decker*, 20 Civ. 2472, 2020 WL 1487274, at *2 (S.D.N.Y. Mar. 27, 2020) ("Considerations of judicial economy—the [c]ourt has already read and digested the record and heard lengthy oral argument on this motion—and the urgent need to timely decide [p]etitioners' motion for a temporary restraining order in light of the immediate risk to the health of the [p]etitioners

3

counsel against severance at this juncture."); *see also Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1953847, at *3 (S.D.N.Y. Apr. 23, 2020) (denying respondents' request to sever a similar action brought by petitioner-detainees); *Coronel*, 20 Civ. 2472, ECF No. 35 at 3 (S.D.N.Y. Apr. 1, 2020) (denying without prejudice respondents' motion to sever the joint petition after receiving further briefing).

Second, a single habeas action is merited because this matter is "uncluttered by subsidiary issues." *United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125–26 (2d Cir. 1974). In *Sero*, the Second Circuit considered a proposed habeas corpus class action brought by young adult misdemeanants (ages 16 to 21), on behalf of themselves and all others similarly situated, who were serving a reformatory sentence in excess of the adult penalty for the same misdemeanor. *Id.* at 1119. The court of appeals held that a "multi-party proceeding similar to the class action authorized by [Rule 23 of the Federal Rules] of Civil Procedure" was permissible, because the judiciary has the inherent authority under the All Writs Act, 28 U.S.C. § 1651, to fashion "expeditious methods of procedure in a specific case." *Id.* at 1125 (citing *Harris v. Nelson*, 394 U.S. 286, 294 (1969)); *see also Bertrand v. Sava*, 684 F.2d 204, 219 (2d Cir. 1982) (finding no error in the district court's decision to "certify a [habeas] class of 'all Haitian aliens transferred from [an Immigration and Naturalization Service facility] . . . , who have requested political asylum and parole, but have remained in respondent's custody'" (citation omitted)).

Here, the health risks posed by COVID-19 and the constitutional claims presented do not turn on facts unique to each Petitioner beyond their having preexisting conditions that make them vulnerable to the virus. *Cf. Bob v. Decker*, No. 19 Civ. 8226, ECF No. 4 at 3 (S.D.N.Y. Oct. 15, 2019) (requiring three *pro se* petitioners to proceed in three separate habeas actions, because the

petitioners each alleged that they were denied a different type of medical care).  Rather, Petitioners raise almost identical questions of law and fact, including whether Respondents are adequately protecting Petitioners from contracting COVID-19, whether Respondents are deliberately indifferent to Petitioners' medical needs, and whether release from detention is justified under these circumstances.  *See* Petition.

Third, Petitioners allege shared harms, including the alleged systemic failure of Respondents to identify and protect individuals in immigration detention at the Bergen, Essex, and Orange County Jails who are at high risk of complications from COVID-19.  The extraordinary circumstance of the COVID-19 crisis warrants a multi-party habeas petition permitting expeditious resolution of the claims before the Court.

The Court concludes, therefore, that considerations of "judicial economy and fairness argue persuasively for the construction of a procedure" such as this multi-party habeas action, where Petitioners "shar[e] certain complaints about the legality" of their confinement.  *Bertrand v. Sava*, 535 F. Supp. 1020, 1024 (S.D.N.Y. 1982) (citations omitted), *rev'd on other grounds*, 684 F.2d 204 (2d Cir. 1982); *see also id.* at 1024–25 ("Such initiative and flexibility are essential to modern use of the writ [of habeas corpus] in order to cut through barriers of form and insure that miscarriages of justice are corrected.").

Accordingly, Respondents' request to sever the action into five individual habeas petitions is DENIED.

II.    Venue

Respondents argue that they are not properly named in the petition, because although Petitioners are detained at the command and under the authority of Respondents, Respondents have contracted with state facilities to hold them.  Resp. Opp. at 19–20.  28 U.S.C. § 2242 provides that an application for a writ of habeas corpus should be directed to "the person who has custody over [the applicant]."  *See also* 28 U.S.C. § 2243 ("The writ, or order to show cause shall be directed to the person having custody of the person detained.").  The Supreme Court has held that in challenges to detention, therefore, the proper respondent is the "person who has the *immediate custody* of the party detained, with the power to produce the body of [petitioner] before the court or judge."  *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (internal quotation marks and citation omitted).  Respondents contend that Petitioners' immediate custodians are the respective wardens of the facilities that currently house them.  Resp. Opp. at 19–20.  And, because three of the Petitioners are detained in facilities in New Jersey, Respondents argue that the Southern District of New York is not the proper venue for their claims.  *Id.*; *see Padilla*, 542 U.S. at 451 (Kennedy, J., concurring) ("[W]hen an action is brought in the district court, it must be filed in the district court whose territorial jurisdiction includes the place where the custodian is located.").

The Court disagrees.  Though it remains an unsettled question, "courts in this [d]istrict have repeatedly recognized, in cases where a petitioner is detained in a non-federal facility pursuant to the power and authority of the federal government and under a contract with the federal government, the proper respondent is the federal official with the most immediate control over that facility."  *Cruz v. Decker*, No. 18 Civ. 9948, 2019 WL 4038555, at *3 (S.D.N.Y. Aug. 27, 2019) (internal quotation marks and citation omitted) (collecting cases), *aff'd*, No. 18 Civ.

9948, 2019 WL 6318627 (S.D.N.Y. Nov. 26, 2019).  Petitioners are held in county jails under contracts with ICE, but they are "in custody pursuant only to the power and authority of the federal government," and, therefore, the person with the power to produce their bodies and effect their release is "the *federal* official most directly responsible for overseeing the contract facility." *Rodriguez Sanchez v. Decker*, No. 18 Civ. 8798, 2019 WL 3840977, at *2 (S.D.N.Y. Aug. 15, 2019) (emphasis added) (internal quotation marks, citation, and alterations omitted); *see also You v. Nielsen*, 321 F. Supp. 3d 451, 461 (S.D.N.Y. 2018) ("Petitioner's immediate custodian is not the warden of the Bergen County Jail, but, in fact, ICE officials located in this district."); *Matias Madera v. Decker*, No. 18 Civ. 7314, 2018 WL 10602037, at *3 (S.D.N.Y. Sept. 28, 2018) ("[T]he ICE District Director represents the first and most immediate federal official who is able [to] respond to the petition and, if indicated, deliver the relief sought.").

In this case, "Field Office Director Decker [is] the federal official with the most immediate control over the non-federal facility in which Petitioner[s] [are] being detained," and is the proper respondent.  *Rodriguez Sanchez*, 2019 WL 3840977, at *4; *see also, e.g.*, *Garcia v. Decker*, No. 20 Civ. 1345, 2020 WL 1435007, at *2 (S.D.N.Y. Mar. 24, 2020) ("Respondent Decker is located within this District and, as Director of the ICE NY Field Office, has control over [p]etitioner's detention."); *Matias Madera*, 2018 WL 10602037, at *4 ("Respondent Decker is thus [the] proper respondent in these proceedings, because he can order the release of [p]etitioner.").  And Decker's office is located within the territorial jurisdiction of this Court. *See* Petition ¶ 11.

Accordingly, Respondents' motion to dismiss Decker and to transfer the claims of Ferreyra, Perdomo Perdomo, and Villiers to the District of New Jersey is DENIED.

However, "there is generally only one proper respondent to a given prisoner's habeas petition." *Padilla*, 542 U.S. at 434.  Unlike Decker, Wolf is the acting Secretary of Homeland Security, a "remote supervisory official" who does not have "immediate custody" of Petitioners. *Id.* at 435 (internal quotation marks and citation omitted); *see* Petition ¶ 12.  Because he is "only connected to Petitioner[s] as Decker's supervisor," he is "not a proper party to this case." *Matias Madera*, 2018 WL 10602037, at *4.

Accordingly, Wolf is DISMISSED from this action.

III.   Temporary Restraining Order

A.  Legal Standard

"It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction." *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) (collecting cases).  A TRO sought against government action taken pursuant to a statute or regulatory scheme requires that "the moving party . . . demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016).  "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted).

B.  Analysis

1.  Irreparable Harm

To establish irreparable harm, Petitioners "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and

imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id*. (internal quotation marks and citation omitted).  Petitioners have shown irreparable harm by establishing the risk of injury to their health and constitutional rights.  *See Barbecho v. Decker*, No. 20 Civ. 2821, 2020 WL 1876328, at *6 (S.D.N.Y. Apr. 15, 2020) ("[I]rreparable harm exists where, as here, petitioners face imminent risk to their health, safety, and lives." (internal quotation marks and citation omitted)).  The Court addresses each harm in turn.

a.   Risk of Serious Illness or Death

Based on the record before it, the Court concludes that Petitioners face a risk of serious illness or death in civil immigration detention at the Bergen, Essex, and Orange County Jails.

i.   Bergen, Essex, and Orange County Jails

As of the date of this opinion, there are more than 2.9 million confirmed cases of COVID-19 worldwide, with over 900,000 cases in the United States.  Center for Systems Science and Engineering at Johns Hopkins University, *Coronavirus COVID-19 Global Cases*, Coronavirus Resource Center (Apr. 27, 2020), https://coronavirus.jhu.edu/map.html.  Some 207,431 people have died from the disease worldwide; at least 17,280 have died in New York City, all in the course of a few weeks.  *Id.*  The New York-New Jersey area is recognized as a global epicenter for the pandemic, accounting for more than 40% of the United States' COVID-19 cases and almost 50% of the nation's deaths due to the virus.  Petition ¶ 25.

In New Jersey, there have been 109,038 confirmed cases and 5,938 deaths.  New Jersey Dep't of Health, *New Jersey COVID-19 Dashboard*, Official Site of the State of New Jersey (Apr. 26, 2020), https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml.  14,965 of those cases are in Bergen County, where Ferreyra and Villiers are housed, and 12,863 of those cases are in Essex County, where Perdomo Perdomo is detained, and those counties have had

955 and 1023 deaths, respectively. *Id.* In Orange County, where Denizard is being held, COVID-19 is spreading rapidly: 7,770 people have been infected and 274 people have died. *Orange County NY COVID-19 Cases by Town*, https://ocnygis.maps.arcgis.com/apps/opsdashboard/index.html#/21de1fb5ce0c480f95dc0cf2b8b 83b71 (Apr. 27, 2020); *see also* Petition ¶ 34 (noting 7,152 confirmed cases and 243 deaths as of April 21, 2020).

The jails are no exceptions. Each of the jails where a Petitioner is housed has reported confirmed cases of COVID-19. Petition ¶ 2; TRO Mem. at 1. This includes, at the time of the TRO's filing, at least 24 correction officers, four nurses, two ICE detainees, and one county inmate at the Bergen County Jail; at least 57 staff members, three ICE detainees, and five county inmates, as well as 98 inmates and detainees in quarantine, at the Essex County Jail; and one correction officer confirmed infected, and four correction officers alleged to have been infected, at the Orange County Jail. Petition ¶ 45; TRO Mem. at 12–13.

The nature of detention facilities makes exposure and spread of the virus particularly harmful. Gregg S. Gonsalves, Ph.D., an epidemiologist at the Yale School of Medicine and School of Public Health, submitted a declaration in this matter, discussing the conditions at the Bergen, Essex, and Orange County Jails after reviewing, Centers for Disease Control and Prevention ("CDC") guidance, ICE guidance, and declarations filed by the jails' directors. Gonsalves Decl. ¶¶ 3, 43, ECF No. 4-2. It is Gonsalves' "professional judgment that individuals placed in these jails are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected." *Id.* ¶ 62. Jaimie Meyer, M.D., M.S., who has worked extensively on infectious disease treatment and prevention in the context of jails and prisons, agrees; she

submitted a declaration in this district noting that the risk of COVID-19 to people held in New York-area detention centers "is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected."  Meyer Decl. ¶ 7, *Velesaca v. Wolf*, 20 Civ. 1803 (S.D.N.Y. Feb. 28, 2020), ECF No. 42.

"It is nearly impossible to prevent widespread infections inside the Bergen, Essex, and Orange County Jails because detainees live, sleep, and use the bathroom in close proximity with others, and because 'behind bars, some of the most basic disease prevention measures are against the rules or simply impossible.'"  Petition ¶ 54 (citation and alteration omitted).  Gonsalves explains that the Bergen, Essex, and Orange County Jails are "under-equipped and ill-prepared to manage the current COVID-19 outbreak within these facilities and to prevent further community spread.  This reality will result in severe harm to those detained, as well as corrections and civilian staff at the facilities and the broader New York and New Jersey community."  Gonsalves Decl. ¶ 44.  Gonsalves concludes that "[r]educing the size of the population in jails and prisons is crucially important to reducing the level of risk both for those within those facilities and for the community at large."  *Id.* ¶ 63.

A number of courts in this district and elsewhere have recognized the threat that COVID-19 poses to individuals held in jails and other detention facilities.  *See, e.g.*, *United States v. Roberts*, No. 18 Cr. 528-5, 2020 WL 1700032, at *1 (S.D.N.Y. Apr. 8, 2020) ("[A]n inmate in . . . a dense urban jail in which several inmates have tested positive for COVID-19 . . . faces a particularly grave danger of contracting the disease."); *United States v. Butler*, No. 19 Cr. 834-10, 2020 WL 1689778, at *2 (S.D.N.Y. Apr. 7, 2020) ("COVID-19 presents a heightened risk for incarcerated [individuals] . . . with respiratory and cardiac ailments. . . . [T]he crowded nature of federal detention centers . . . present an outsize risk that the COVID-19 contagion, once it

gains entry, will spread.").  Addressing the situation in New Jersey specifically, the New Jersey

Supreme Court has held that "reduction of county jail populations, under appropriate conditions,

is in the public interest to mitigate risks imposed by COVID-19" in light of "the profound risk

posed to people in correctional facilities arising from the spread of COVID-19," and has ordered

the release of many individuals serving sentences in New Jersey county jails.  *In the Matter of*

*the Request to Commute or Suspend County Jail Sentences*, Case No. 84230 (N.J. Mar. 22,

2020).  Likewise, the New York Department of Corrections and Community Supervision has

implemented a plan to release as many as 1,100 jail inmates "in response to a growing number of

COVID-19 cases in local jails over the past few days and weeks," in order to "protect a

vulnerable population from contracting and transmitting this infectious disease."  DOCCS

COVID-19 Report, Department of Corrections and Community Supervision (Apr. 25, 2020),

https://doccs.ny.gov/doccs-covid-19-report.

ii.    Petitioners' Medical Conditions

Courts have recognized the health risk posed by COVID-19 to be particularly acute for

detainees who have underlying illnesses.  *See Jones v. Wolf*, No. 20 Civ. 361, 2020 WL

1643857, at *13 (W.D.N.Y. Apr. 2, 2020) ("[P]etitioners with the CDC-identified vulnerabilities

face a grave, irreparable risk to their health and safety if they remain confined under current

conditions" in a facility where COVID-19 is spreading); *United States v. Martin*, No. 19 Cr. 140-

13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) ("[T]he Due Process Clauses of the Fifth or

Fourteenth Amendments, for federal and state pretrial detainees, respectively, may well be

implicated if defendants awaiting trial can demonstrate that they are being subjected to

conditions of confinement that would subject them to exposure to serious (potentially fatal, if the

detainee is elderly and with underlying medical complications) illness.").

12

The Court takes judicial notice that COVID-19 causes severe medical complications and has increased lethality amongst people of advanced age, and those with underlying health problems, or both. *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html ("[O]lder adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19."); *Information for Healthcare Professionals: COVID-19 and Underlying Conditions*, Centers for Disease Control and Prevention (Apr. 6, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html (listing, among other medical diagnoses, "moderate to severe asthma," "people who have serious heart conditions," "severe obesity," "people who are immunocompromised," and "diabetes" as conditions that trigger higher risk of severe illness from COVID-19); *see* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."); *Valenzuela Arias*, 2020 WL 1847986, at *4 (taking judicial notice of medical conditions recognized by the CDC as resulting in increased risks of contracting COVID-19 or developing serious, and potentially fatal, complications from the virus).

Petitioners are at particular risk for serious illness or death, because their preexisting medical conditions either make them more vulnerable to contracting COVID-19, or more likely to develop serious complications due to COVID-19, or both.  Each Petitioner has underlying illnesses, including chronic respiratory illnesses such as asthma and emphysema, inflammation

of the lungs, shortness of breath, diabetes, hypertension, and histories of smoking.  Petition ¶¶ 6–9.[3]

The risk that Petitioners will face a severe, and quite possibly fatal, infection while in civil immigration detention constitutes irreparable harm warranting a TRO.  *See Barbecho v. Decker*, No. 20 Civ. 2821, 2020 WL 1876328, at *6 (S.D.N.Y. Apr. 15, 2020) (concluding that detainees at Bergen County Jail "face a risk of severe, irreparable harm—including death—if they contract COVID-19" and met burden of showing irreparable harm); *Valenzuela Arias*, 2020 WL 1847986, at *5 (holding that immigration detainees at Essex County Jail faced irreparable harm because of the threat of COVID-19); *Coronel*, 2020 WL 1487274, at *3 ("Due to their serious underlying medical conditions, all [p]etitioners [at Hudson, Bergen, Essex, and Orange County Jails] face a risk of severe, irreparable harm if they contract COVID-19. . . . [B]eing in immigration detention places Petitioners at significantly higher risk of contracting COVID-19. Individuals in carceral settings are at a 'significantly higher' risk of spreading infectious diseases." (citation omitted)); *Basank v. Decker*, 20 Civ. 2518, 2020 WL 1481503, at *4 ("The risk that [p]etitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO."); *Velesaca v. Decker*, No. 20 Civ. 2643, Order, ECF No. 29 (S.D.N.Y. Apr. 16, 2020) (granting immediate release to petitioner detained at Orange County Jail in light of the COVID-19 pandemic); *Nikolic v. Decker*, No. 20 Civ.  2500, ECF No. 19 at 1 (S.D.N.Y. Apr. 3, 2020) (ordering release of medically vulnerable individual from Orange County Jail in light of COVID-19).

---

[3]  The Court is concerned that Perdomo Perdomo's low level of cognitive functioning may severely limit his ability to abide by social distancing requirements and other preventive measures.  Petition ¶ 8.  The Court also notes that Villiers' health has only been further compromised because his inhaler, prescribed to treat his asthma, was taken from him when he was apprehended by ICE.  *Id.* ¶ 9.

### b. Constitutional Violations

Second, Petitioners have also shown irreparable injury because, as discussed below, they face a violation of their constitutional rights. In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm. *See, e.g.*, *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (internal quotation marks and citations omitted)); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of success on the merits of a constitutional violation is not necessary); *Sajous v. Decker*, No. 18 Civ. 2447, 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2018) (finding that immigration detainee established irreparable injury by alleging that prolonged immigration detention violated his constitutional due process rights).

The Court finds, therefore, that Petitioners have established the threat of irreparable harm absent a TRO.

### 2. Likelihood of Success on the Merits

The Court concludes that Petitioners have met their burden of showing a likelihood of success on the merits. Petitioners argue that their remaining in an ICE detention center where COVID-19 is present and without adequate protection for their health violates their due process rights. TRO Mem. at 8. The Court agrees.

a.   Legal Standard

The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the government from depriving a person of life, liberty, or property without due process of law.  The protection applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  An application for habeas corpus under 28 U.S.C. § 2241 is the appropriate vehicle for an inmate in federal custody to challenge conditions or actions that pose a threat to his medical wellbeing.  *See Roba v. United States*, 604 F.2d 215, 218–19 (2d Cir. 1979) (allowing a § 2241 application to challenge an inmate's "transfer while seriously ill" where that transfer posed a risk of fatal heart failure).

Immigration detainees can establish a substantive due process violation for unmet medical needs by showing that a government official "knew, or should have known" of a condition that "posed an excessive risk to health," and failed to take appropriate action.  *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).  "Deliberate indifference" to serious medical needs "can be established by either a subjective or objective standard:  A plaintiff can prove deliberate indifference by showing that the defendant official recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to the plaintiff's health or safety."  *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019) (internal quotation marks, citation, and alterations omitted).

Additionally, the Supreme Court has recognized that government authorities may be deemed "deliberately indifferent to an inmate's current health problems" where they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering

16

the next week or month or year," including "exposure of inmates to a serious, communicable disease," even when "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Petitioners need not demonstrate that "they actually suffered from serious injuries" to show a due process violation. *Darnell*, 849 F.3d at 31; *see Helling*, 509 U.S. at 33. Instead, showing that the conditions of confinement "pose an unreasonable risk of serious damage to their future health" is sufficient. *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35 (alteration omitted)).

b.   Analysis

Respondents argue that ICE has set in motion various steps to improve health and sanitation at the Bergen, Essex, and Orange County Jails, and Respondents have submitted declarations of the facilities' wardens attesting to the actions taken. *See generally* ECF No. 7. Petitioners have established, however, that Respondents have left in place conditions of confinement that result in COVID-19 posing an unreasonable risk of serious damage to their health. The measures that ICE and the Bergen, Essex, and Orange County Jails have taken fail to adequately protect Petitioners' health in several crucial ways.

First, the Court finds that Respondents have not implemented specific measures to identify, protect, and treat inmates who are at a heightened risk of contracting or suffering grave complications from COVID-19. For example, protection of high-risk detainees appears to be limited to "daily monitoring of these inmates and detainees and the establishment of a plan to remove the inmates from the rest of the population should the need arise." Ortiz Decl. ¶ 15(f), (g) (describing conditions at Essex County Jail); *see generally* Ahrendt Decl. (providing no information about measures taken to protect at-risk detainees at Bergen County Jail); Catletti Decl. (same, for Orange County Jail); Flynn Decl. (same, for Orange County Jail). It is

17

unclear—and at the hearing Respondents could not clarify—what the specifics of this "daily monitoring" entail.  *See also* Gonsalves Decl. ¶ 51 n.65  (noting that the facilities fail to explain "who conducts that monitoring, how, when, or where it is conducted, or what steps are taken if a person exhibits symptoms of COVID-19 infection").  For detainees with underlying conditions like Petitioners', monitoring them for signs of infection is too little, too late.  Committing to "monitor" detainees rings especially hollow when, as Respondents conceded during oral argument, the monitoring depends on the person being monitored to report symptoms.  The best, and perhaps only, way to protect Petitioners is to prevent infection in the first place. Respondents have not yet taken meaningful steps to do so.

Second, with respect to general conditions of confinement, the evidence submitted by Respondents does not indicate that social distancing is being practiced in various daily situations inside the Bergen, Essex, and Orange County Jails.  *See How to Protect Yourself & Others*, Centers for Disease Control and Prevention (Apr. 13, 2020), https://www.cdc.gov/coronavirus/ 2019-ncov/prepare/prevention.html (recommending maintaining at least six feet of distance from other persons at all times and noting that "keeping distance from others is especially important for people who are at higher risk of getting very sick").  At the Bergen County Jail, for example, detainees sleep in bunk beds; at the Essex County Jail, they sleep in either a cell with a bunk bed, or in a dorm, which includes "bunks around the perimeter of the dorm" with "a seating area and recreation yard" in the center of the dorm.  Ortiz Decl. ¶ 6.  Respondents cannot be heard to say that while asleep in bunk beds, inmates are positioned six feet apart from one another.  *Compare* Ahrendt Decl. ¶ 6, ECF No. 29-3 (claiming that social distancing is possible in Bergen County Jail cells that measure 10 feet by 7 feet and have bunk beds, but failing to explain how cellmates can maintain a six-foot distance while asleep or when moving about the cell in order to use the

toilet or stretch their legs); Ortiz Decl. ¶ 6 (claiming that "spacing in the buildings [in Essex County Jail] allow" for social distancing, but failing to address whether bunk beds in dorms permit social distancing), *with* Picasso Decl. ¶ 6, ECF No. 4-6 (noting that detainees in Essex County Jail sleep "very close together—two people in a small room with bunk beds"); *see also* Paul Decl. ¶ 9 ("The jail was supposed to enforce social distancing but they did not enforce it. It's impossible to keep a safe distance when you are locked in with 56 detainees in one pod. Every other cell shares a vent, I know this because sometimes I would be able to smell the odor coming from the cell next to mine. If that person were to get infected, I surely would have too.") (describing conditions at Orange County Jail).

Moreover, even in the common areas, it does not appear that detainees are being required to practice social distancing. *See* Picasso Decl. ¶¶ 4–5 (attesting that it was impossible to maintain six feet of distance in the common space); Martinez Decl. ¶ 7 ("The [Bergen County] jail was supposed to enforce us not being together, but their attempt to do this was a failure. All they did was tell us that we had to be moved because there could not be too many of us together. However, they were not prepared for the move.  It was impossible to keep us distant because there were about 56 of us who had to be moved. When they brought in new people, they did not perform any exam on them for the virus."); Paul Decl. ¶ 11 (noting that Orange County Jail detainees "were all allowed to interact with everyone else from our pod," and "did not have enough space to keep a safe distance in the pod.").  Even at the Orange County Jail, where Respondents represent that they are not aware of any positive cases among detainees, the lack of testing, the failure to enforce social distancing, and the failure to provide masks or gloves for use by inmates or staff, all place the facility at risk for the introduction and spread of COVID-19. *See Hernandez Roman v. Wolf*, 5:20 Civ. 768, ECF No. 53 ¶¶ 33 (C.D. Cal. Apr. 23, 2020)

("While there are not, yet, any confirmed COVID-19 cases at [the] Adelanto [ICE Processing

Center], it is, merely, fortuitous that an outbreak has not yet occurred, especially given the lax

safety standards, now, in place.").  As Gonsalves opines, "[g]enerally social distancing is

impossible to obtain in a jail or prison setting, and none of the ICE declarations provide any

evidence to alter my view."  Gonsalves Decl. ¶ 55.  Respondents have put forth no expert

opinion to rebut Gonsalves' declaration, including his finding that consistent social distancing is

virtually impossible in jail settings.  The undisputed expert evidence before the Court indicates,

therefore, that the precautionary measures implemented at these facilities are inadequate to

address the risk of severe illness or death confronting detainees with underlying medical

conditions.

Though the Bergen, Essex, and Orange County Jails have taken some steps to mitigate

the spread of COVID-19, the risk of Petitioners' infection is still very real.  The Bergen County

Jail has suspended detainee intake, implemented medical screening for county inmate intake,

required temperature checks and medical screening for staff members and vendors entering the

facility, put into practice measures to evaluate, test, treat, quarantine, and segregate inmates or

detainees, provided information to staff and detainees about the importance of handwashing and

other ways to reduce the spread of COVID-19, required inmates and detainees to wear surgical

masks when they are out of their cells, permitted only six inmates or detainees to use the

recreational space at a given time, and limited attorney visits to window visits only.  Resp. Opp.

at 8–10; *see also* Ahrendt Decl. ¶¶ 6–9, ECF No. 7-6.  The Essex County Jail has implemented

health and temperature checks for all detainees who enter the facility, provided additional on-site

medical staff, obtained testing kits, obtained protective equipment and supplies, educated staff,

inmates, and detainees on best practices, put into place new food service protocols (including no

longer permitting detainees or inmates to work in the kitchens), increased cleaning, suspended classes and religious services led by volunteers, and limited attorney visits to window visits only. Resp. Opp. at 11–12; *see also* Ortiz Decl. ¶¶ 8–9, 15–21, ECF No. 7-7.  And the Orange County Jail has suspended all ICE incoming detainees, screened incoming inmates for fever and respiratory illness, developed quarantine protocols, screened staff members, vendors, and visitors (which includes having their temperatures taken, prior to entering the facility), educated staff, detainees, and inmates regarding COVID-19 protocols, and increased cleaning and sanitization. Resp. Opp. at 13–14; *see also* Flynn Decl. ¶¶ 17–20, ECF No. 7-9; Catletti Decl. ¶¶ 8–9, ECF No. 7-8.

These measures likely result in some reduction of risk of infection, but they are insufficient.  As the declarants in support of Petitioners' application attest, the facilities still see obviously symptomatic inmates among the general population, limited access to soap and protective gear such as masks and gloves, the failure of detainees to practice social distancing, and the facilities' failure to enforce it.  *See, e.g.*, Saenz Decl. ¶¶ 16–29, ECF No. 4-1; Paul Decl. ¶ 14, ECF No. 4-4 (noting that detainees at the Orange County Jail were not allowed to have alcohol-based hand sanitizer and had difficulty obtaining extra soap); *see also* Resp. Opp. at 10–14 (conceding that the Bergen County Jail issues masks, but not gloves, to detainees, and that at the Essex County Jail, only symptomatic detainees are provided masks, and Orange County Jail does not provide masks to staff or detainees).  Detainees also report that because they received little information about COVID-19 from the jails, they gathered together to watch the news on television in order to learn about the virus, *see* Martinez Decl. ¶ 4, ECF No. 4-8; Mendez Ramirez Decl. ¶ 4, ECF No. 4-3.  In some cases, detainees wait a week to see a doctor after complaining of cough, fever, and respiratory issues, C.G.L. Decl. ¶ 3, ECF No. 4-7.  Detainees

state that showers and phones are not being cleaned or disinfected regularly, and that they resort to placing a stocking over the phone for protection.  *E.g.*, Martinez Decl. ¶ 13.  And although the jails may intend to wipe down phones after each use, sanitization has been spotty.  *See* Paul Decl. ¶ 7 (attesting that correction officers at the Orange County Jail would often forget to bring the bleach needed to disinfect the phones).

The Bergen, Essex, and Orange County Jails also "cohort" detainees who have been exposed to individuals who have tested positive for COVID-19—that is, house them together with one another, and separate from the rest of the population.  *See* Resp. Opp. at 10, 12, 14.  But cohorting in this manner does nothing to stop the spread of untested cases; indeed, in some situations, it might exacerbate the spread of disease, if asymptomatic but infected detainees mingle with uninfected ones.  According to the CDC, cohorting is a practice that should be used only as a last resort.  *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (indicating that individuals should be cohorted together only if facilities are unable to accommodate individual isolation); *see also* Gonsalves Decl. ¶ 47 n.59 ("[T]he Bergen County Jail cohorts people who have tested positive for COVID-10 in the same unit with people who are symptomatic and waiting for test results, which directly contradicts the CDC guidelines.  Further, overall the facilities do not appear to test individuals who were exposed but are asymptomatic but instead cohort them with others, inadvertently spreading the virus as part of their protection plan." (citations omitted)).  Respondents do not claim, however, that they cohort detainees because isolation of individual inmates is not possible at these facilities.

Finally, Respondents have offered no evidence indicating that testing is systematically used to ascertain the scope of, contain, and treat the outbreak—or the threat of an outbreak in the case of the Orange County Jail. *See* Ahrendt Decl. ¶ 9(h) (failing to address whether symptomatic or high-risk individuals at the Bergen County Jail are tested and under what circumstances, or explain whether other individuals will be tested); Ortiz Decl. ¶¶ 4, 16(a), 17–18 (indicating that  Essex County Jail acquired 50 testing kits, but failing to explain how those kits can be used effectively to protect a jail population of close to 2,000); Catletti Decl. ¶ 9(f) (stating that the Orange County Jail follows CDC guidance with respect to testing, without providing any specifics, including which detainees or inmates are being tested).  And although the warden of the Essex County Jail reports that the facility is "rolling out rapid COVID-19 testing for its entire population," Ortiz Decl. ¶ 32, there is no indication (and at oral argument, Respondents were unable to clarify) whether or when that process will begin, how long it will take, or what response will follow.

A number of courts in this district and beyond have held that habeas petitioners have demonstrated a likelihood of success under similar conditions.  In *Basank*, this Court ordered immediate release of ten individuals detained in ICE custody at county jails in New Jersey, including the Bergen and Essex County Jails.  2020 WL 1481503, at *4; *see also Basank*, 2020 WL 1953847, at *13 (converting TRO into preliminary injunction on supplemented record).  The *Basank* petitioners suffered from underlying illnesses including asthma, obesity, and respiratory problems.  *Basank*, 2020 WL 1481503, at *1; *see also Valenzuela Arias*, 2020 WL 1847986, at *9 (ordering the immediate release of two individuals detained in ICE custody at Essex County Jail).

In *Coronel*, another court in this district released seven ICE detainees at the Bergen, Essex, and Orange County Jails, due to their underlying medical conditions, which include obesity, hypertension, and gastrointestinal problems.  2020 WL 1487274, at *1, *10.  As in *Coronel*, "ICE has not taken any action to address the particular risks COVID-19 poses to high-risk individuals like the Petitioners here."  *Id.* at *4.  The same critical deficiency led another court in this district to find a likelihood of success on the merits of a deliberate indifference claim brought by a detainee in the Orange County Jail.  *See Velesaca v. Decker*, No. 20 Civ. 2643, TRO Hr'g Tr. at 23:10–15, ECF No. 30 (S.D.N.Y. Apr. 13, 2020) ("[A]lthough the record reflects the respondents have taken general proactive steps to prevent the spread of COVID-19 in the Orange County Correctional Center, consistent with other courts in this district, I find such measures are unresponsive to [petitioner's] needs as a high-risk individual").  Likewise, in *Avendaño Hernandez v. Decker*, a court in this district held that an immigration detainee had established a "substantial claim for deliberate indifference" where ICE and the county jail in which he was held had "not taken any action to address the particular risks that COVID-19 poses to high-risk individuals," but rather had taken "only generalized proactive measures to prevent detainees within [their] care from contracting and spreading the virus."  No. 20 Civ. 1589, 2020 WL 1547459, at *2–3 (S.D.N.Y. Mar. 31, 2020).  In *Barbecho*, another court in this district ordered the release of three high-risk detainees from the Bergen County Jail, who suffered from circulatory diseases, obesity, lung abnormalities, and had a history of smoking. 2020 WL 1876328, at *1.  As here, the *Barbecho* Court found that "beyond [a] custody re-assessment, [r]espondents have failed to offer any evidence of measures designed to address the needs of those high-risk detainees who ICE has re-assessed and determined should remain in ICE custody."  *Id.* at 4.[4]

---

[4]  Courts in other districts have also found that ICE detainees have shown a likelihood of success on their claims that

The Court holds, therefore, that Petitioners are likely to succeed on the merits of their due process claim that Respondents knew or should have known that Petitioners' conditions of confinement pose excessive risks to their health and that their specific medical needs are unmet.[5]

### 3. Balance of Equities and Public Interest

The equities and public interest weigh heavily in Petitioners' favor. Petitioners face irreparable injury—to their constitutional rights and to their health. The potential harm to Respondents is limited. Respondents have not identified any specific danger to the public or risk of flight that would justify Petitioners' confinement in dangerous conditions, *see generally* Resp. Opp. In any event, in granting the TRO, the Court will impose conditions of release that will address any such concerns.[6] Respondents note that Ferreyra and Denizard are mandatorily

---

continued confinement, without adequate protection for their health, violates their due process rights. In *Hope v. Doll*, a court granted the immediate release of 22 immigration detainees held at facilities with reported COVID-19 cases, finding that "the protective measures in place . . . are not working." No. 20 Civ. 562, ECF. No. 11 at 13 (M.D. Pa. Apr. 7, 2020). As the court explained, "[i]t now seems that our worst fears have been realized—COVID-19 is spreading, and not nearly enough is being done to combat it. We cannot allow the [p]etitioners before us, all at heightened risk for severe complications from COVID-19, to bear the consequences of ICE's inaction." *Id.* at 19. A court in that same district released 13 individuals from ICE detention, who suffered from medical conditions such as high blood pressure, diabetes, asthma, and trouble breathing. *Thakker v. Doll*, No. 20 Civ. 480, 2020 WL 1671563, at *1, *10 (M.D. Pa. Mar. 31, 2020). In finding that the petitioners had shown a likelihood of success on the merits, the court noted that the petitioners had demonstrated that, "despite their best efforts, they cannot practice these effective preventative measures in [detention] [f]acilities." *Id.* at *8. "Considering . . . the grave consequences that will result from an outbreak of COVID-19, particularly to the high-risk [p]etitioners in this case," the court determined that it "cannot countenance physical detention in such tightly-confined, unhygienic spaces." *Id.* In *Malam v. Adducci*, the court released an ICE detainee, notwithstanding the precautionary measures taken by the facility, because the petitioner was "not ensured anything close to reasonable safety." No. 20 Civ. 10829, 2020 WL 1672662, at *12 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) (internal quotation marks and citation omitted). The court found that "the only reasonable response by [r]espondents is the release of [p]etitioner; any other response demonstrates a disregard of the specific, severe, and life-threatening risk to [p]etitioner from COVID-19." *Id.*

[5] The Court does not reach Petitioners' additional argument that they are likely to succeed on the merits of the claim that their due process rights were violated because their conditions of confinement are punitive. TRO Mem. at 9–10.

[6] In actions brought by ICE detainees seeking habeas relief amid the COVID-19 epidemic, courts in this district, including this one, have considered the individual circumstances of the petitioners and crafted conditions of release for those individuals. *See, e.g.*, *Valenzuela Arias*, No. 20 Civ. 2802, ECF Nos. 20 and 21 (S.D.N.Y. Apr. 11, 2020) (imposing conditions, *inter alia*, home incarceration—the most restrictive condition of release—with telephonic and electronic monitoring, including placement of a beacon device in petitioner's residence); *see also Barbecho v. Decker*, No. 20 Civ. 2821, ECF No. 26 (S.D.N.Y. Apr. 16, 2020) (prohibiting petitioner from operating a motor vehicle and imposing other conditions such as telephonic and electronic monitoring); *Avendaño Hernandez v. Decker*, No. 20 Civ. 1589, ECF No. 30 (S.D.N.Y. Apr. 20, 2020) (requiring ankle monitoring and weekly call-ins to ICE); *Coronel v. Decker*, 20 Civ. 2472, ECF No. 28 (S.D.N.Y. Mar. 27, 2020) (releasing petitioners on their own

detained pursuant to 8 U.S.C. § 1226(c).  Resp. Opp. at 16.  However, courts have the authority

to order those held in violation of their due process rights released, notwithstanding § 1226(c).

*See Cabral v. Decker*, 331 F. Supp. 3d 255, 259 (S.D.N.Y. 2018) (collecting cases).  Thus,

Respondents have failed to justify Petitioners' continued detention in unsafe conditions.

　　　　Finally, the public interest favors Petitioners' release.  Petitioners are confined for civil

violations of the immigration laws.  In the highly unusual circumstances posed by the COVID-19

crisis, the continued detention of aging or ill civil detainees does not serve the public's interest.

To the contrary, public health and safety are served best by rapidly decreasing the number of

individuals held in confined, unsafe conditions.  *See, e.g.*, *Grand River Enterprises Six Nations,*

*Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (referring to "public health" as a "significant

public interest").  As another court in this district has observed, "[d]ecreasing the [ICE detention]

population will . . . 'mitigate the damage' to both the [j]ail and the surrounding community and

thereby 'reduce the death toll.'"  *Barbecho*, 2020 WL 1876328, at *7 (discussing the Bergen

County Jail) (quoting *United States v. Nkanga Nkanga*, No. 18 Cr. 713, 2020 WL 1529535, at *1

(S.D.N.Y. Mar. 31, 2020)).  "Indeed, reducing the size of the population in jails and prisons

reduces the level of risk both for those within those facilities and for the community at large."

*Id.* (internal quotation marks, citation, and alterations omitted).

　　　　Accordingly, the Court holds that Petitioners have established their entitlement to a TRO

under Rule 65 of the Federal Rules of Civil Procedure.[7]

---

recognizance and requiring enrollment in the Intensive Supervision Appearance Program in addition to electronic
monitoring).

[7] Respondents argue that "any injunctive relief should not apply once a final order of removal is entered," because
"the issuance of such final orders changes the legal basis of immigration detainees' detention."  Resp. Opp. at 29
n.7.  It is true that a different statutory provision authorizes detention of noncitizens against whom a final order of
removal has been entered, *see* 8 U.S.C. § 1231(a)(2), but that change in statutory authority does not alter the
unconstitutionality of holding detainees in conditions where they face an unreasonable risk of being infected with a
deadly virus, the irreparable harm it causes, or the rank inequity and harm to the public that would result.  Perhaps, if
a final order of removal were entered against a Petitioner and not stayed by a court of appeals, and Respondents

IV.    *Mapp v. Reno*

Even if Petitioners had not met the requirements for a TRO, the Court would release them on bail pending final resolution of their habeas claims under the Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001).  In *Mapp*, the Second Circuit held "that the federal courts have inherent authority to admit to bail individuals properly within their jurisdiction" including immigration detainees petitioning for habeas relief.  *Id.*  A habeas petitioner's "fitness for bail" depends on "whether the habeas petition raises substantial claims and whether extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective."  *Id.* at 230 (internal quotation marks, citation and alteration omitted).

For the reasons already stated, Petitioners' habeas claims are plainly substantial.  Indeed, as the Court has already held, they are likely to succeed on the merits.  And releasing Petitioners from confinement pending final adjudication of their petition is necessary to "make the habeas remedy effective."  *Id.*  "Severe health issues have been the prototypical but rare case of extraordinary circumstances that justify release pending adjudication of habeas."  *Coronel*, 2020 WL 1487274, at *9 (collecting cases); *see, e.g.*, *Barbecho*, 2020 WL 1876328, at *8 ("If these Petitioners—whose medical conditions place them at a higher risk of severe illness, or death, from COVID-19—were to remain detained, they would face a significant risk that they would contract COVID-19—the very outcome they seek to avoid. Release is therefore necessary to make the habeas remedy effective." (internal quotation marks and citation omitted)); *United States v. Nkanga*, No. 18 Cr. 713, 2020 WL 1695417, at *3 (S.D.N.Y. Apr. 7, 2020) (granting bail pending resolution of a habeas claim under 28 U.S.C. § 2255 given "the defendant's age; his multiple health issues; the nature of the defendant's offense; [and] the precise timing of the

---

sought to execute that order without subjecting the Petitioner to unconstitutional conditions along the way, a modification of preliminary injunctive relief would be warranted, but the Court declines to pass on a hypothetical situation.

sentencing proceeding (which occurred on March 12, 2020) in relation to the emerging COVID-19 pandemic" (internal quotation marks and citation omitted)); *Avendaño Hernandez*, 2020 WL 1547459, at *3 ("Petitioner argues that he is being subject to unconstitutional conditions of confinement—specifically, continued risk of exposure to COVID-19—and he seeks release so that he can avoid infection.  If Petitioner were to remain detained, he would face a significant risk that he would contract COVID-19—the very outcome he seeks to avoid." (internal quotation marks, citation and alterations omitted)).  Detention of Petitioners pending final adjudication of this action could cause severe illness or death—precisely the harm their petition seeks to avert. The effectiveness of the habeas remedy can only be preserved, therefore, by Petitioners' remaining released for the duration of this matter.

Accordingly, the Court holds, in the alternative to granting Petitioners' application for a TRO, that bail shall be imposed pending final resolution of their petition for habeas corpus. Their bail conditions shall be the same as those to be set under the TRO, as indicated below.

## CONCLUSION

For the reasons stated in this opinion, the TRO is GRANTED as follows:

(1) Respondents and the Bergen, Essex, and Orange County Jails are ORDERED to release Petitioners upon satisfaction of conditions to be imposed by the Court.  It is further ORDERED that the parties shall meet and confer, and, by **4:00 p.m.** on **April 27, 2020**, propose reasonable conditions of release for each Petitioner.

Respondents are RESTRAINED from arresting Petitioners for civil immigration detention purposes unless Respondents first obtain the Court's permission.

The TRO will expire on **May 11, 2020**, at **10:45 a.m.**  No later than **May 4, 2020**, Respondents must show cause why the TRO should not be converted to a preliminary injunction. Petitioners may file a response no later than **May 8, 2020**.

Respondent Chad Wolf is DISMISSED from the case.  The Clerk of Court is directed to terminate the motion at ECF No. 4.

SO ORDERED.

Dated: April 27, 2020, 10:45 a.m.
       New York, New York

_____
ANALISA TORRES
United States District Judge