UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HENRY FERREYRA, JEFFERSON DENIZARD,
ANGEL PERDOMO PERDOMO, ROLANDO
OSHANE VILLIERS, REMIGIO TAPIA VILCHIS,

                                Petitioners,

                -against-

THOMAS DECKER, in his official capacity as Director
of the New York Field Office of U.S. Immigration and
Customs Enforcement,

                                Respondent.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/22/2020
```

20 Civ. 3170 (AT)

**OPINION
AND ORDER**

ANALISA TORRES, District Judge:

Petitioners Henry Ferreyra, Jefferson Denizard, Angel Perdomo Perdomo, and Rolando

Oshane Villiers were detained by Immigration and Customs Enforcement ("ICE") in county jails

where cases of COVID-19 have been identified.[1]  Petition ¶¶ 6–9, ECF No. 1.  Petitioners filed a

petition for a writ of habeas corpus under 28 U.S.C. § 2241, requesting release from ICE custody

because of the public health crisis posed by COVID-19.  *See id.*  Petitioners also submitted an

application for a temporary restraining order ("TRO")[2] and preliminary injunction pursuant to

Rule 65 of the Federal Rules of Civil Procedure, seeking an order (1) releasing them on their

own recognizance, subject to reasonable and appropriate conditions, and (2) restraining

Respondents, Thomas Decker, as Director of the New York Field Office of ICE, and Chad

Wolf,[3] as Acting Secretary of the U.S. Department of Homeland Security, from arresting

---

[1] The Petition included a fifth Petitioner, Remigio Tapia Vilchis.  TRO Mot. 1 n.1, ECF No. 4.  Respondent agreed to release Vilchis prior to the filing of the motion for a TRO.  *Id.*  Accordingly, in this order "Petitioners" refers only to Ferreyra, Denizard, Perdomo Perdomo, and Villiers.

[2] Petitioners filed their motion for a TRO and memorandum in support in a single ECF document.  To avoid confusion, the Court will cite to pages in the motion itself as "TRO Mot.," and to pages in the supporting memorandum of law as "TRO Mem."

[3] Although Petitioners originally sued Decker and Wolf, this Court dismissed Wolf from the case on April 27, 2020.  *Ferreyra v. Decker*, No. 20 Civ. 3170, 2020 WL 1989417, at *4, *13 (S.D.N.Y. Apr. 27, 2020).  Accordingly, in this order "Respondent" refers only to Decker.

Petitioners for civil immigration detention purposes during the pendency of their immigration proceedings.  *See* TRO Mot. at 1–2, ECF No. 4.

The Court granted the TRO, and directed Respondent to show cause why it should not be converted into a preliminary injunction.  *Ferreyra v. Decker*, No. 20 Civ. 3170, 2020 WL 1989417, at *13 (S.D.N.Y. Apr. 27, 2020).  For the reasons stated below, Petitioners' request for a preliminary injunction is GRANTED as follows:  (1) Petitioners shall remain released on the conditions set by the Court, *see* ECF Nos. 14–17, and (2) Respondent is RESTRAINED from arresting Petitioners for civil immigration detention purposes unless Respondent first obtains the Court's permission.

## BACKGROUND

Petitioners were detained by ICE in connection with removal proceedings.  *See* Petition ¶ 18.  They were housed in two New Jersey and one New York county jails where either detainees or staff have tested positive for COVID-19.  Petition ¶ 2; TRO Mem. at 1.  Specifically, Ferreyra and Villiers were detained at the Bergen County Correctional Facility ("Bergen County Jail").  Petition ¶¶ 6, 9.  Perdomo Perdomo was detained at the Essex County Correctional Facility ("Essex County Jail").  *Id.* ¶ 8.  And Denizard was detained at the Orange County Correctional Facility ("Orange County Jail").  *Id.* ¶ 7.  Ferreyra, Perdomo Perdomo, and Villiers were held in connection with removal proceedings pending at the Varick Street Immigration Court.  *Id.* ¶¶ 6, 8, 9.

Each Petitioner suffers from chronic medical conditions, and faces an imminent risk of serious injury or death if exposed to COVID-19.  Ferreyra, who has smoked for almost four decades, is 53 years old, and suffers from asthma, emphysema, and diabetes.  *Id.* ¶ 6.  Additionally, he has been diagnosed with severe psychiatric conditions, including schizophrenia,

chronic post-traumatic stress disorder ("PTSD"), major depressive disorder, episodic paroxysmal anxiety, and anxiety disorder.  *Id.*  Denizard, age 27 and a daily smoker, has diminished lung capacity, shortness of breath during any type of physical activity, and a compromised immune system; he also suffers from severe chronic pain.  *Id.* ¶ 7.  At 50, Perdomo Perdomo is a long-time smoker and suffers from deformities of the nose, inflammation of the lungs, problems with his prostate gland, and possible cirrhosis of the liver.  *Id.* ¶ 8.  In 2017, he was hit by a vehicle and had to undergo brain surgery to alleviate swelling.  *Id.*  As a result, Perdomo Perdomo has "extremely low cognitive functioning," which makes conforming with social distancing and other preventive measures challenging.  *Id.*  Villiers is 24 and suffers from asthma.  *Id.* ¶ 9.  He was initially detained at the Essex County Jail and then transferred to the Bergen County Jail, where he was housed at the filing of the Petition.  *Id.*  Though he was previously prescribed an inhaler, it was taken from him once he was detained at the Bergen County Jail.  *Id.*

Petitioners moved for a TRO on April 23, 2020.  ECF No. 4.  The Court held a telephonic hearing on April 24, 2020, *see* April 24, 2020 minute entry, and on April 27, 2020, entered a TRO ordering Petitioners' release, *Ferreyra*, 2020 WL 1989417, at *13.  The Court extended the TRO for good cause for an additional fourteen days in order to consider the parties' submissions on the question of whether the TRO should be converted to a preliminary injunction.  ECF No. 23.[4]  The Court now addresses, in turn, Respondent's argument that the action should be severed into four individual proceedings, the question of venue, and the merits of Petitioners' request for a preliminary injunction.

---

[4] The Court concludes that the record is sufficient to resolve the matter without an evidentiary hearing.  *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) ("An evidentiary hearing is not required when the relevant facts either are not in dispute . . . or when the disputed facts are amenable to complete resolution on a paper record." (citations omitted)).

# DISCUSSION

### I.   Severance

Consistent with its decision at the TRO stage, the Court remains unpersuaded by Respondent's argument that the petition should be severed into separate habeas actions. *Ferreyra*, 2020 WL 1989417, at *2–3; Resp. Opp. at 15–16, ECF No. 18.

The Court denied Respondent's request to sever Petitioners' claims for two reasons. First, the Court concluded that severance is inappropriate on the grounds of judicial economy and fairness. *Ferreyra*, 2020 WL 1989417, at *2. Courts in this district have relied on this principle to deny the Government's request to sever a number of multi-party habeas petitions similar to this one. *See Coronel v. Decker*, 20 Civ. 2472, 2020 WL 1487274, at *2 (S.D.N.Y. Mar. 27, 2020) (severance denied because "the [c]ourt has already read and digested the record and heard lengthy oral argument on this motion [for emergency relief]"); *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1953847, at *3 (S.D.N.Y. Apr. 23, 2020) (denying respondents' request to sever a similar action brought by petitioner-detainees); *Valenzuela Arias v. Decker*, No. 20 Civ. 2802, 2020 WL 2306565, at *2 (S.D.N.Y. May 8, 2020) (reaffirming at preliminary injunction stage that severance in similar multi-party habeas action was inappropriate on the grounds of judicial economy and fairness). The amount of effort expended by this Court has only increased since the TRO stage, and splitting Petitioners' claims now would create even greater inequity.

Second, the Court concluded that a single habeas action is merited because this matter is "uncluttered by subsidiary issues." *United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125–26 (2d Cir. 1974); *Ferreyra*, 2020 WL 1989417, at *2. In *Sero*, the Second Circuit considered a proposed habeas corpus class action brought by young adult misdemeanants (ages 16 to 21), on

behalf of themselves and all others similarly situated, who were serving a reformatory sentence in excess of the adult penalty for the same misdemeanor. *Id.* at 1119. The court of appeals held that a "multi-party proceeding similar to the class action authorized by [Rule 23 of the Federal Rules] of Civil Procedure" was permissible, because the judiciary has the inherent authority under the All Writs Act, 28 U.S.C. § 1651, to fashion "expeditious methods of procedure in a specific case." *Id.* at 1125 (citing *Harris v. Nelson*, 394 U.S. 286, 294 (1969)); *see also Bertrand v. Sava*, 684 F.2d 204, 219 (2d Cir. 1982) (finding no error in the district court's decision to "certify a [habeas] class of 'all Haitian aliens transferred from [an Immigration and Naturalization Service facility] . . . , who have requested political asylum and parole, but have remained in respondent's custody'" (citation omitted)).

Respondent contests the applicability of *Sero*, arguing that unlike in that case, each Petitioner here relies on different medical conditions and are housed at different facilities, run by separate local governments. Resp. Opp. at 15–16. These arguments misapprehend Petitioners' claims. Although they have different underlying illnesses, Plaintiffs share an increased risk of serious complications if they contract the virus. And notwithstanding the fact that Petitioners were housed in different detention centers, Petitioners' claims turn on Respondent's systemic failure to appropriately identify and protect individuals at high risk for contracting COVID-19 and suffering serious harm as a result, which is common to all Petitioners.

The Court remains convinced, therefore, that a procedure such as this multi-party habeas action is appropriate where Petitioners "shar[e] certain complaints about the legality" of their confinement. *Bertrand v. Sava*, 535 F. Supp. 1020, 1024 (S.D.N.Y. 1982) (citations omitted), *rev'd on other grounds*, 684 F.2d 204 (2d Cir. 1982); *see also id.* at 1024–25 ("Such initiative

and flexibility are essential to modern use of the writ [of habeas corpus] in order to cut through barriers of form and insure that miscarriages of justice are corrected.").

Accordingly, Respondent's request to sever the action into four individual habeas petitions is DENIED.

II.     Venue

As it did at the TRO stage, the Court rejects Respondent's argument that the petition names the wrong respondent and that this district is not the proper venue for the claims of Ferreyra, Perdomo Perdomo, and Villiers.  Resp. Opp. at 16–17.  "As courts in this [d]istrict have repeatedly recognized, in cases where a petitioner is detained in a non-federal facility pursuant to the power and authority of the federal government and under a contract with the federal government, the proper respondent is the federal official with the most immediate control over that facility."  *Cruz v. Decker*, No. 18 Civ. 9948, 2019 WL 4038555, at *3 (S.D.N.Y. Aug. 27, 2019) (internal quotation marks and citation omitted) (collecting cases), *aff'd*, No. 18 Civ. 9948, 2019 WL 6318627 (S.D.N.Y. Nov. 26, 2019).

In this case, "Field Office Director Decker [is] the federal official with the most immediate control over the non-federal facility in which Petitioner[s] [are] being detained," and is the proper respondent.  *Rodriguez Sanchez v. Decker*, 18 Civ. 8798, 2019 WL 3840977, at *4 (S.D.N.Y. Aug. 15, 2019); *see also, e.g.*, *Garcia v. Decker*, No. 20 Civ. 1345, 2020 WL 1435007, at *2 (S.D.N.Y. Mar. 24, 2020) ("Respondent Decker is located within this [d]istrict and, as Director of the ICE NY Field Office, has control over [p]etitioner's detention."); *Matias Madera v. Decker*, 18 Civ. 7314, 2018 WL 10602037, at *4 (S.D.N.Y. Sept. 28, 2018) ("Respondent Decker is thus [the] proper respondent in these proceedings, because he can order the release of [p]etitioner.").  ICE acknowledges that its Field Office Directors are "chiefly

responsible" for the detention and confinement of ICE detainees, including the conditions of confinement, akin to the responsibility that a local warden would typically exercise over local criminal detainees. *See* Office of Inspector General Report at 2, ECF No. 22-12 ("ICE [Enforcement and Removal Operations ("ERO")] has 24 Field Office Directors who are chiefly responsible for detention facilities in their assigned geographic area. ICE ERO oversees the confinement of detainees in nearly 250 detention facilities that it manages in conjunction with private contractors or state or local governments, as previously noted. ERO staff are responsible for monitoring conditions of confinement at these facilities."). Decker, the person "chiefly responsible" for the detention of Petitioners, is located within the territorial jurisdiction of this Court. *See* Petition ¶ 11. Consistent with its decision at the TRO stage, the Court concludes that Respondent is the proper respondent, and venue is proper in this district; Respondent has offered no basis for the Court to reach a different result.

Accordingly, Respondent's motion to dismiss Decker as a party and to transfer the claims of Ferreyra, Perdomo Perdomo, and Villiers to the District of New Jersey is DENIED.

III.   Preliminary Injunction

A.  Legal Standard

A preliminary injunction sought against government action taken pursuant to a statute or regulatory scheme requires that "the moving party . . . demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016). "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation

omitted).

      B.   Analysis

          1.   Irreparable Harm

To establish irreparable harm, Petitioners "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (internal quotation marks and citation omitted).  Petitioners have shown irreparable harm by establishing the risk of injury to their health and constitutional rights.  *See Barbecho v. Decker*, No. 20 Civ. 2821, 2020 WL 1876328, at *6 (S.D.N.Y. Apr. 15, 2020) ("[I]rreparable harm exists where, as here, petitioners face imminent risk to their health, safety, and lives." (internal quotation marks and citation omitted)).  The Court addresses each harm in turn.

          a.   Risk of Serious Illness or Death

Based on the record before it, the Court concludes that Petitioners face a risk of serious illness or death in civil immigration detention at the Bergen, Essex, and Orange County Jails.

          i.   Bergen, Essex, and Orange County Jails

As of the date of this opinion, there are more than 5 million confirmed cases of COVID-19 worldwide and over 1.5 million cases in the United States.  Center for Systems Science and Engineering at Johns Hopkins University, *Coronavirus COVID-19 Global Cases*, Coronavirus Resource Center (May 22, 2020), https://coronavirus.jhu.edu/map.html.  Some 335,418 people have died from the disease worldwide; at least 28,743 have died in New York.  *Id.*  In Orange County in particular, 10,258 people have been confirmed infected and 428 people have died.  *Orange County NY COVID-19 Cases by Town*,

https://ocnygis.maps.arcgis.com/apps/opsdashboard/index.html#/21de1fb5ce0c480f95dc0cf2b8b

8

83b71 (May 22, 2020).  New Jersey also has a devastating outbreak of the virus, with 1,515 and 1,585 deaths in Bergen and Essex Counties, respectively.  New Jersey Dep't of Health, *New Jersey COVID-19 Dashboard*, Official Site of the State of New Jersey (May 22, 2020), https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml (noting 152,719 confirmed cases and 10,985 deaths statewide).

The nature of detention facilities makes exposure and spread of the virus particularly harmful.  Gregg S. Gonsalves, Ph.D., an epidemiologist at the Yale School of Medicine and School of Public Health, submitted a declaration in this matter, discussing the conditions at the Bergen, Essex, and Orange County Jails, after reviewing Centers for Disease Control and Prevention ("CDC") guidance, ICE guidance, and the declarations filed by the jails' directors. Gonsalves Decl. ¶¶ 3, 43, ECF No. 22-11.  It is Gonsalves' "professional judgment that individuals placed in these jails are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected." *Id.* ¶ 63.  Jaimie Meyer, M.D., M.S., who has worked extensively on infectious disease treatment and prevention in the context of jails and prisons, agrees; she submitted a declaration in another action in this district noting that the risk of COVID-19 to people held in New York-area detention centers "is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected."  Meyer Decl. ¶ 7, *Velesaca v. Wolf*, 20 Civ. 1803 (S.D.N.Y. Feb. 28, 2020), ECF No. 42.

This Court also recently concluded that vulnerable detainees at the Bergen and Essex County Jails are at risk of serious illness or death, notwithstanding the additional measures taken at the facility.  *Basank*, 2020 WL 1953847, at *6; *Valenzuela Arias*, 2020 WL 2306565, at *5.  A

number of other courts in this district have also recognized the threat that COVID-19 poses to detained individuals, including those at the Bergen, Essex, and Orange County Jails.  *See, e.g.*, *Coronel*, 2020 WL 1487274, at *3 ("[B]eing in immigration detention places [p]etitioners at significantly higher risk of contracting COVID-19.  Individuals in carceral settings are at a 'significantly higher' risk of spreading infectious diseases." (citation omitted)); *see also In the Matter of the Request to Commute or Suspend County Jail Sentences*, Case No. 84230 (N.J. Mar. 22, 2020) (holding that "reduction of county jail populations, under appropriate conditions, is in the public interest to mitigate risks imposed by COVID-19" in light of "the profound risk posed to people in correctional facilities arising from the spread of COVID-19").

ii.     Petitioners' Medical Conditions

Courts have recognized the health risk posed by COVID-19 to be particularly acute for detainees who have underlying illnesses.  *See Jones v. Wolf*, No. 20 Civ. 361, 2020 WL 1643857, at *13 (W.D.N.Y. Apr. 2, 2020) ("[P]etitioners with the CDC-identified vulnerabilities face a grave, irreparable risk to their health and safety if they remain confined under current conditions" in a facility where COVID-19 is spreading); *United States v. Martin*, No. 19 Cr. 140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) ("[T]he Due Process Clauses of the Fifth or Fourteenth Amendments, for federal and state pretrial detainees, respectively, may well be implicated if defendants awaiting trial can demonstrate that they are being subjected to conditions of confinement that would subject them to exposure to serious (potentially fatal, if the detainee is elderly and with underlying medical complications) illness.").

The Court takes judicial notice that COVID-19 causes severe medical complications and has increased lethality among people with underlying health problems.  *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (May 14, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html ("[P]eople of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19."); *see* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."); *Basank*, 2020 WL 1953847, at *7 (taking judicial notice of medical conditions recognized by the CDC as resulting in increased risk of contracting COVID-19 or developing serious, and potentially fatal, complications from the virus).

Petitioners are at particular risk for serious illness or death, because their preexisting medical conditions either make them more vulnerable to contracting COVID-19, or more likely to develop serious complications due to COVID-19, or both.  Each Petitioner has underlying illnesses, including chronic respiratory illnesses such as asthma and emphysema, inflammation of the lungs, shortness of breath, diabetes, hypertension, and a history of smoking.  Petition ¶¶ 6–9.[5]  Respondent argues that Petitioners Denizard, Perdomo Perdomo, and Villiers do not appear to meet CDC standards for high-risk individuals.  Resp. Opp. at 22–24.  The Court disagrees.

First, with respect to Denizard and Perdomo Perdomo, both regular smokers, Petition ¶¶ 7–8, Respondent argues that "smokers have not been identified by the CDC as a group at higher risk of severe illness," Resp. Opp. at 23.  Respondent is incorrect that Denizard and Perdomo Perdomo's history of smoking, along with their other underlying conditions, do not place them at a higher risk for COVID-19 complications under CDC guidance.  The CDC has specifically identified smoking as an underlying condition that may cause individuals to be

---

[5] The Court is concerned that Perdomo Perdomo's low level of cognitive functioning may severely limit his ability to abide by social distancing requirements and other preventive measures.  Petition ¶ 8.

immunocompromised and especially vulnerable to COVID-19.  *See People at Risk for Serious*

*Illness from COVID-19*, Centers for Disease Control and Prevention (May 14, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.  In a

recent study, the CDC likewise concluded that "patients with underlying health conditions and

risk factors, including, but not limited to, . . . smoking, might be at higher risk for severe disease

or death from COVID-19."  *Preliminary Estimates of the Prevalence of Selected Underlying*

*Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February*

*12–March 28, 2020*, CDC Morbidity and Mortality Weekly Report (Apr. 3, 2020),

http://dx.doi.org/10.15585/mmwr.mm6913e2.  The Court, therefore, rejects Respondent's

assertion that Denizard and Perdomo Perdomo are not more vulnerable to the effects of the virus

as compared to the general population.

Likewise, the Court rejects Respondent's argument that Villiers' asthma does not place

him in the high-risk category because it is not "moderate-to-severe" asthma.  *See* Resp. Opp. at

23.  CDC guidelines provide that people with asthma, or other respiratory problems are at a

heightened risk of severe illness or death from contracting COVID-19.  *See People at Risk for*

*Serious Illness from COVID-19*, Centers for Disease Control and Prevention (May 14, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.  And

a recent CDC report shows that asthma was one of the most common underlying conditions for

younger people (18–49 years old) hospitalized with COVID-19 in the United States.  Shikha

Garg, et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-*

*Confirmed Coronavirus Disease 2019—COVID-NET, 14 States, March 1–30, 2020,* CDC

Morbidity and Mortality Weekly Report (Apr. 17, 2020),

https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf.  The danger posed to an

individual who suffers from asthma increases when that person cannot access the medication needed to treat his condition.  *See* Villiers Decl. ¶ 9, ECF No. 22-8 (noting that Villiers' inhaler, prescribed to treat his asthma, was taken from him when he was apprehended by ICE and never returned).  Based on the CDC guidance and reports, the Court continues to hold that Villiers is at particular risk for suffering grave illness or death from COVID-19.

The risk that Petitioners will face a severe, and quite possibly fatal, infection in immigration detention constitutes irreparable harm warranting a preliminary injunction.  *See Barbecho*, 2020 WL 1876328, at *6 (concluding that detainees who "face a risk of severe, irreparable harm—including death—if they contract COVID-19" met burden of showing irreparable harm); *Coronel*, 2020 WL 1487274, at *3 ("Due to their serious underlying medical conditions, all [p]etitioners [at Bergen and Essex County Jails] face a risk of severe, irreparable harm if they contract COVID-19. . . . [B]eing in immigration detention places [p]etitioners at significantly higher risk of contracting COVID-19.  Individuals in carceral settings are at a 'significantly higher' risk of spreading infectious diseases." (citation omitted)); *Basank*, 2020 WL 1953847, at *7 (holding that immigration detainees at the Bergen and Essex County Jails faced irreparable harm because of the threat of COVID-19.

### b.  Constitutional Violations

Second, Petitioners have also shown irreparable injury because they allege a violation of their constitutional rights.  In the Second Circuit, it is well settled that an alleged constitutional violation constitutes irreparable harm.  *See, e.g.*, *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (internal quotation marks and citation omitted)); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999)

13

("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of success on the merits of a constitutional violation is not necessary); *Sajous v. Decker*, No. 18 Civ. 2447, 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2018) (finding that immigration detainee established irreparable injury by alleging that prolonged immigration detention violated his constitutional due process rights).

The Court finds, therefore, that Petitioners have established the threat of irreparable harm absent the preliminary injunction.

### 2.   Likelihood of Success on the Merits

Petitioners argue that a return to confinement in the Bergen, Essex, and Orange County Jails would violate their due process rights.  Pet. Reply at 10–20, ECF No. 22.  The Court agrees. Notwithstanding the steps that have been taken at these facilities since the Court issued its TRO, Petitioners have met their burden of showing a likelihood of success on the merits.

### a.   Legal Standard

The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the government from depriving a person of life, liberty, or property without due process of law.  The protection applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  An application for habeas corpus under 28 U.S.C. § 2241 is the appropriate vehicle for an inmate in federal custody to challenge conditions or actions that pose a threat to his medical wellbeing.  *See Roba v. United States*, 604 F.2d 215, 218–19 (2d Cir. 1979)

(allowing a § 2241 application to challenge an inmate's "transfer while seriously ill" where that transfer posed a risk of fatal heart failure).

Immigration detainees can establish a substantive due process violation for unmet medical needs by showing that a government official "knew, or should have known" of a condition that "posed an excessive risk to health," and failed to take appropriate action.  *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).  "Deliberate indifference" to serious medical needs "can be established by either a subjective or objective standard:  A plaintiff can prove deliberate indifference by showing that the defendant official recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to the plaintiff's health or safety."  *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019) (internal quotation marks, citation, and alterations omitted).

Additionally, the Supreme Court has recognized that government authorities may be deemed "deliberately indifferent to an inmate's current health problems" where they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," including "exposure of inmates to a serious, communicable disease," even when "the complaining inmate shows no serious current symptoms."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Petitioners need not demonstrate that "they actually suffered from serious injuries" to show a due process violation.  *Darnell*, 849 F.3d at 31; *see Helling*, 509 U.S. at 33.  Instead, showing that the conditions of confinement "pose an unreasonable risk of serious damage to their future health" is sufficient.  *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35 (alteration omitted)).

b.  Analysis

Respondent argues that ICE has set in motion various steps to improve health and sanitation at the Bergen, Essex, and Orange County Jails, and Respondent has submitted declarations of the facilities' management attesting to the actions taken.  *See generally* Resp. Opp.; Ahrendt Decl., ECF No. 18-7; Ahrendt Supp. Decl., ECF No. 18-8; Ortiz Decl., ECF No. 18-9; Ortiz Supp. Decl., ECF No. 18-10; Anicette Decl., ECF No. 18-11; Catletti Decl., ECF No. 18-12; Flynn Decl., ECF No. 18-13.  They point out that the Bergen County Jail has suspended ICE detainee intake, implemented medical screening for county inmate intake, required temperature checks and medical screening for staff members and vendors entering the facility, increased cleaning of housing units and common areas, provided information to staff and detainees about the importance of handwashing and other ways to reduce the spread of COVID-19, required inmates and detainees to wear masks when they are out of their cells, permitted only six inmates or detainees to use the recreational space at a given time, and limited attorney visits to window visits only.  Resp. Opp. at 9–11; *see also* Ahrendt Decl. ¶¶ 7–9.  The Essex County Jail has implemented health and temperature checks for all detainees who enter the facility, provided additional on-site medical staff, obtained testing kits, obtained protective equipment and supplies, educated staff, inmates, and detainees on best practices, put into place new food service protocols (including no longer permitting detainees or inmates to work in the kitchens), increased cleaning, suspended classes and religious services led by volunteers, and limited attorney visits to window visits only.  Resp. Opp. at 11–13; *see also* Ortiz Decl. ¶¶ 8–9, 15–21. And the Orange County Jail has suspended all ICE incoming detainees, screened incoming inmates for fever and respiratory illness, developed quarantine protocols, screened staff members, vendors, and visitors (which includes having their temperatures taken, prior to entering

the facility), educated staff, detainees, and inmates regarding COVID-19 protocols, increased cleaning and sanitization, and provided detainees with hand sanitizer and soap.  Resp. Opp. at 13–14; *see also* Flynn Decl. ¶¶ 11–17; Catletti Decl. ¶ 9.  Respondent contends that these measures undercut Petitioners' deliberate indifference claim.  Resp. Opp. at 18–22.

The standard for deliberate indifference, however, is not one of malice.  Rather, Petitioners may establish deliberate indifference through intentional denial of care (the subjective standard), *or* by showing that Respondent "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [Respondent] knew, or should have known, that the condition posed an excessive risk to [the Petitioners'] health or safety" (the objective standard).  *Charles*, 925 F.3d at 87.  Based on the record before it, the Court concludes that the inadequate measures implemented by Respondent amount to a reckless failure to act with reasonable care to protect Petitioners as high-risk individuals.[6]

First, the Court finds that Respondent has not put into place an adequate action plan to identify, protect, and treat detainees who are at a heightened risk of contracting or suffering grave complications from COVID-19.  Neither the Bergen nor the Orange County Jail has provided any information on specialized procedures that take account of the elevated risk of serious illness or death that detainees like Petitioners face.  *See generally, e.g.,* Flynn Decl.; Ahrendt Decl.; Catletti Decl.  In fact, the Bergen County Jail concedes that "[d]etainees with medical conditions that place them at higher risk of COVID-19 complications are not currently housed in a special unit."  Ahrendt Supp. Decl. ¶ 10.  On the other hand, the Essex County Jail

---

[6] The Court concludes that Petitioners have established a likelihood of success on the merits on their substantive due process claim, both articulated as a conditions of confinement claim, *see Helling*, 509 U.S. at 33 (discussing a conditions of confinement claim and raising "exposure of inmates to a serious, communicable disease" as an example), as well as an unmet medical needs claim, *see Charles*, 925 F.3d at 87 (discussing deliberate indifference to medical needs).  Indeed, where, as here, a communicable disease renders the general conditions of confinement dangerous to Petitioners' health, and meeting Petitioners' medical needs requires that Respondent take specific measures to prevent their infection, the conditions of confinement and unmet medical needs claims essentially merge.

indicates that vulnerable detainees "are being housed separately," and that staff working with them wear personal protective gear.  Ortiz Decl. ¶ 33.  These measures are inadequate, however, because detainees are designated as high-risk only if, in the facility's judgment, they have "chronic conditions that place them at higher risk for COVID-19" *and* "those conditions are not well-controlled."  Ortiz Supp. Decl. ¶ 18, ECF No. 18-10.  It is not clear how the facility determines which underlying illnesses are "well-controlled," nor is there any evidence that an inmate with a "well-controlled" chronic condition is not still at increased risk of experiencing complications from a COVID-19 infection.

Moreover, Respondent cannot provide assurances that COVID-19 is not already present among the general population at the Bergen and Orange County Jails, or in the case of the Essex County Jail, in the separately housed vulnerable population.  Protection of high-risk detainees appears to be limited to "daily monitoring of these inmates and detainees and the establishment of a plan to remove them from the rest of the population should the need arise," at the Essex County Jail only.  Ortiz Decl. ¶ 15(f), (g) (describing conditions at Essex County Jail); *see also* Ahrendt Decl. (providing no information about measures taken to protect at-risk detainees at Bergen County Jail); Catletti Decl. (same, for Orange County Jail); Flynn Decl. (same, for Orange County Jail).  Although Respondent asserts that the Essex County Jail engages in "daily monitoring" of high-risk detainees, Ortiz Decl. ¶ 15(f), and "increased monitoring" of the detainee population as a whole, *id.* ¶ 15(g), there is evidence that the facility's procedures are not thorough.  For example, detainees recently released from the Essex County Jail report that individuals with apparent COVID-19 symptoms remained among the general population.[7]  *See*

_____

[7] Respondent argues that many of the declarations submitted by Petitioners with their request for a preliminary injunction were "out of date."  Resp. Opp. at 21.  Petitioners have provided updated declarations with their Reply, ECF No. 22, some of which are provided by detainees released as recently on May 1, 2020, *see* Disla Decl., ECF

Khan Decl. ¶ 15, ECF No. 22-4 (stating that after reporting that he was "feeling generalized pain, muscle aches, and had lost [his] sense of taste and smell . . . [n]obody took [his] temperature or gave [him] a blood test"); *id.* ¶¶ 12, 14 (describing other sick detainees who were untreated and kept in the general population); Perez Decl. ¶ 12, ECF No. 22-5 ("While I was [in the Essex County Jail], I can think of about eight people who were sick with headaches and fevers, which I understand are symptoms of coronavirus.  It would take four or five days for these men to go to medical and while they waited, they were still in the dorms around other people.").

Detainees recently released from the Bergen and Orange County Jails recount similar events.  *See, e.g.*, Velasquez Decl. ¶ 20, ECF No. 22-3 (detainee with diabetes recently released from Bergen County Jail noting that "[o]ne time during quarantine, a nurse came around and checked everyone's temperature.  Other than this one time, there were no additional medical services provided to us, even to people like me who have medical conditions"); Denizard Decl. ¶ 11, ECF No. 22-2 (Petitioner previously held at Orange County noting that "[d]uring two weeks in April, the medical staff came and took our temperature but then they stopped.  Many of those times, they used a forehead thermometer that they put against each of our foreheads without any protective covering and without sanitizing the thermometer between uses").

In any event, when it comes to vulnerable detainees like Petitioners, monitoring them for signs of infection is too little, too late.  *See also* Gonsalves Decl. ¶ 52 n.71  (noting that the facilities fail to explain "who conducts that monitoring, how, when, or where it is conducted, or what steps are taken if a person exhibits symptoms of COVID-19 infection").  The best, and perhaps only, way to protect them is to prevent infection in the first place.  Respondent has not taken meaningful steps to do so.

---

No. 22-1, which continue to depict an inadequate response to COVID-19 and troubling conditions of confinement at the Bergen, Essex, and Orange County Jails.

Second, with respect to general conditions of confinement, the evidence submitted by Respondent does not indicate that social distancing is being practiced in various daily situations inside the Bergen, Essex, and Orange County Jails. *See How to Protect Yourself & Others*, Centers for Disease Control and Prevention (Apr. 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (recommending maintaining at least six feet of distance from other persons at all times and noting that "[k]eeping distance from others is especially important for people who are at higher risk of getting very sick"). At the Bergen County Jail, for example, detainees sleep in bunk beds, Ahrendt Decl. ¶ 6; at the Essex County Jail, they sleep in either a cell with a bunk bed, or in a dorm, which includes "bunks around the perimeter of the dorm" with "a seating area and recreation yard" in the center of the dorm, Ortiz Decl. ¶ 6. The Essex County Jail's director concedes that the top and bottom bunks of each bed are separated by less than six feet, and that the beds, which are bolted to the ground, are also less than six feet apart from each other. Ortiz Supp. Decl. ¶ 7; *see also* Ahrendt Decl. ¶ 6 (claiming that social distancing is possible in Bergen County Jail cells that measure 10 feet by 7 feet and have bunk beds, but failing to explain how cellmates can maintain a six-foot distance while asleep or when moving about the cell in order to use the toilet or stretch their legs). Detainees at the Bergen and Essex County Jails have attested to the practical impossibility of social distancing within a cell. *See*, *e.g.*, Ferreyra Decl. ¶ 30, ECF No. 22-6 ("We had a bunk bed [at the Bergen County Jail] and [my cellmate] slept right above me. We were always very close to each other. There was no way we could stay 6 feet apart due to the very small cell."); Khan Decl. ¶ 7 ("The dorm [at the Essex County Jail] is one big hall and there are about 48 people in our dorm. . . . I was always within six feet from other people no matter where I went in the dorm."); Perez Decl. ¶ 4 ("The cells [in the Essex County Jail] were small and I was very

close to my cellmate – I could not stay six feet away from him in the cell.").

Moreover, even in the common areas, it does not appear that detainees can consistently practice social distancing.  Ferreyra Decl. ¶ 28 (noting that at the Bergen County Jail, "[u]sually about 3 cells were let out at a time, allowing for about [four] to [six] people to be out.  When we were let out there was no social distancing in place . . . . Everyone that was released could stand right next to each other.  We could use the microwave back to back," which was never cleaned); Perez Decl. ¶ 6 ("When we were out of our cells [in the Essex County Jail], the group of 30 people would use the phones, the bathrooms and the microwave. . . . We were always very close to one another and always within six feet of one another."); Denizard Decl. ¶ 9 ("We sat together at the tables, played card games and other games, and watched TV sitting right next to each other.  There is only one microwave that we all share and a lot of people would line up close together to wait for the microwave.  It was not cleaned between each use."); Disla Decl. ¶ 11, ECF No. 22-1 (detainee recently released from Orange County Jail noting that he was "in a unit with 45 other people.  We shared the same common area and tables, showers, microwave, and television.  We each had our own cell to sleep in, but during the day we would be in the common areas together.  I was very concerned about the things that we all touched regularly, such as the television remote").

Gonsalves opines that "[g]enerally social distancing is impossible to obtain in a jail or prison setting, and none of the ICE declarations provide any evidence to alter my view." Gonsalves Decl. ¶ 56.  Attempts to practice social distancing are also for naught when detainees are forced to come into contact with surfaces that may have been touched by symptomatic individuals or items that belong to symptomatic individuals.  *See* Khan Decl. ¶ 12 (attesting that when a symptomatic individual was removed from the general population and placed in

21

quarantine, staff at the facility asked the detainees to pick up the symptomatic individual's belongings, without any protective equipment); Velazquez Decl. ¶ 6 (noting that Bergen County Jail phones were never cleaned between uses so detainee would wipe it with his shirt); Perez Decl. ¶ 7 (noting that Essex County Jail phones were not cleaned between uses); Disla Decl. ¶ 13 (noting that Orange County Jail phones were not cleaned between uses and detainee would "do [his] best to clean it by wiping it with a dry paper towel"); *see also* Gonsalves Decl. ¶ 55 ("[W]hile efforts to increase cleaning are admirable, in my opinion the frequencies for cleaning outlines are still inadequate. Rather than cleaning surfaces a handful of times each day, surfaces should be wiped down with disinfecting chemicals on a continual basis each time they are touched to prevent the spread of the virus."). The same concerns are present when detainees are asked to clean their cells, but are not provided adequate cleaning supplies to do so. *See* Ferreyra Decl. ¶¶ 37–38 (recounting that in the Bergen County Jail no cleaning supplies or disinfectants were distributed in order for detainees to clean their cells and using "a shirt off my back" to clean the floor and remove any dust from the cell).

Third, the Bergen, Essex, and Orange County Jails use "cohorting" to separate possibly infected detainees. But instead of isolating each individual, the facility groups them together. *See* Resp. Opp. at 10, 12, 13. This practice risks spreading the virus to otherwise healthy inmates. *See* Gonsalves Decl. ¶ 47. If detainees with underlying illnesses face the possibility of being cohorted with others who may or may not be infected with COVID-19, then the vulnerable detainees face an increased risk of infection with the virus.[8] The cohorting practices described, therefore, does not adequately protect Petitioners.

---

[8] Indeed, a court in this district recently described a similar cohorting practice as a "Kafkaesque approach" that "will inevitably permit the virus to spread." *United States v. Scparta*, No. 18 Cr. 578, 2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020).

Respondent notes that the Essex County Jail has "begun to roll out rapid antibody testing, and it will use those test results to make decisions about housing and quarantining individuals at the facility" in lieu of cohorting.  Resp. Opp. at 22; Ortiz Decl. ¶ 32.  This assurance provides no guarantee of safety.  The facility's medical director explains that population-wide testing is underway using "[a]ntibody blood tests, which are also called serology tests," Anicette Decl. ¶ 8 as a "screening tool to determine appropriate housing conditions," *id.* ¶ 11.  The Essex County Jail first tested all new admissions, then detainees deemed to be high-risk, and is now in the process of testing the remainder of the population.  *Id.* ¶ 13.  The facility quarantines for 14 days any individual who tests positive for certain antibodies associated with COVID-19.  *Id. ¶* 15.

This procedure is deeply flawed, as Meyer explains in her supplemental declaration.  *See* Meyer Supp. Decl., ECF No. 22-15.  Meyer attests that it can take more than a week after infection for a person to develop the relevant antibodies, and even then, a number of confounding factors might lead to the non-development of those antibodies.  *Id.* ¶ 18.  As a result, "when it comes to assessing whether or not a person currently has COVID-19, a negative test result tells us nothing more than if we had not done a test in the first place.  One cannot be reassured by a negative test.  At most, it would be evidence that the individual did not have COVID-19 or was not exposed to it approximately 2 weeks ago."  *Id.* ¶ 19.  Further, "an antibody test still cannot tell us whether or not someone actually has the virus or is contagious to others," because "[t]here is evidence that people can be contagious for weeks before they develop symptoms and for weeks after they have recovered from COVID-19."  *Id.* ¶ 23.  For this reason, Meyer opines that the Essex County Jail "is currently misinterpreting and misusing the results of these antibody tests in a way that puts detained persons and staff at significantly greater risk of harm related to COVID-19," because it is likely to result in contagious individuals being

housed with healthy ones, and insufficient measures being taken to protect detainees wrongly classified as immune.  *Id.* ¶ 30; *see id.* ¶¶ 31–42 (describing in detail the diagnostic errors in the Essex County Jail's testing plan).[9]  Indeed, in her expert opinion, the Essex County Jail's "testing protocol would significantly increase the risk of COVID-19 in the facility *more so than if there was no testing at all*."  *Id.* ¶ 48 (emphasis added).

A number of courts in this district and beyond have held that habeas petitioners have demonstrated a likelihood of success under similar conditions.  In *Basank v. Decker*, this Court ordered immediate release of ten individuals detained in ICE custody at county jails in New Jersey, including the Bergen and Essex County Jails. No. 20 Civ. 2518, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020); *see also Basank*, 2020 WL 1953847, at *13 (converting TRO into preliminary injunction on supplemented record); *Valenzuela Arias*, 2020 WL 2306565, at *2 (S.D.N.Y. May 8, 2020) (same).  In *Coronel*, another court released seven ICE detainees, including detainees at the Essex County Jail, due to their underlying medical conditions, which include obesity, hypertension, and gastrointestinal problems, in light of ICE's insufficient steps to protect high-risk detainees.  2020 WL 1487274, at *1, *10.  The same critical deficiencies

---

[9] Gonsalves corroborates Meyer's assessment:

> It is also particularly concerning that Essex County Jail plans to use serologic, or so-called antibody, testing of detainees to make critical decisions about how to house and isolate its population.  Although Essex County Jail touts this plan as a sign of its commitment to comprehensive testing, antibody testing should not be used to diagnose active infection (PCR-based antigen tests are used for that) nor as a way to ascertain if someone has been exposed to or recovered from or is immune from SARS-COV-2.  The CDC, the Food and Drug Administration ("FDA"), and the World Health Organization ("WHO") all warn against using antibody tests to determine whether an individual is infected or was previously infected with COVID-19. The New York City Department of Health and Mental Hygiene recently warned healthcare providers that "serologic tests should not be used to diagnose acute or priors SARS-CoV-2 infection, nor should they be used to determine immune status to SARS-CoV-2.  Due to the prevalence of false results (e.g. false positive and false negatives), the uncertainty, in fact, lack of evidence to support even a true positive results' association with immune protection, relying on serologic tests in this way may in fact increase exposure to COVID-19 among detainees at Essex County Jail.

Gonsalves Decl. ¶ 50 (internal quotation marks and citations omitted).

have led other courts here to find a likelihood of success on the merits of a deliberate indifference claim brought by ICE detainees, including at the Orange County Jail. *See Velesaca v. Decker*, No. 20 Civ. 2643, TRO Hr'g Tr. at 23:10–15, ECF No. 30 (S.D.N.Y. Apr. 13, 2020) ("[A]lthough the record reflects the respondents have taken general proactive steps to prevent the spread of COVID-19 in the Orange County [Jail], consistent with other courts in this district, I find such measures are unresponsive to [petitioner's] needs as a high-risk individual.").[10]

To be clear, the Court does not hold that the CDC's guidelines amount to strict rules of constitutional law that Respondent must follow in every circumstance. The Court does, however, take the numerous ways in which the Bergen, Essex, and Orange County Jails have failed to implement protective measures for high-risk individuals to be an overwhelming indication that the conditions of confinement are dangerous to detainees like Petitioners, and that their specific medical needs as vulnerable individuals would go unmet in custody. Thus, as the Court previously concluded, that "Respondent[]knew or should have known that Petitioners' conditions of confinement pose excessive risks to their health and that their specific medical needs are unmet." *Ferreyra*, 2020 WL 1989417, at *11.[11]

---

[10] Courts in other districts have also found that ICE detainees have shown a likelihood of success on their claims that continued confinement, without adequate protection for their health, violates their due process rights. In *Hope v. Doll*, a court granted the immediate release of 22 immigration detainees held at facilities with reported COVID-19 cases, finding that "the protective measures in place . . . are not working." No. 20 Civ. 562, ECF. No. 11 at 13 (M.D. Pa. Apr. 7, 2020). As the court explained, "[i]t now seems that our worst fears have been realized—COVID-19 is spreading, and not nearly enough is being done to combat it. We cannot allow the [p]etitioners before us, all at heightened risk for severe complications from COVID-19, to bear the consequences of ICE's inaction." *Id.* at 19. A court in that same district released 13 individuals from ICE detention, who suffered from medical conditions such as high blood pressure, diabetes, asthma, and trouble breathing. *Thakker v. Doll*, No. 20 Civ. 480, 2020 WL 1671563, at *1, *10 (M.D. Pa. Mar. 31, 2020). In finding that the petitioners had shown a likelihood of success on the merits, the court noted that the petitioners had demonstrated that, "despite their best efforts, they cannot practice these effective preventative measures in [detention] [f]acilities." *Id.* at *8. "Considering . . . the grave consequences that will result from an outbreak of COVID-19, particularly to the high-risk [p]etitioners in this case," the court determined that it "cannot countenance physical detention in such tightly-confined, unhygienic spaces." *Id.*
[11] The Court does not reach Petitioners' additional argument that they are likely to succeed on the merits of the claim that their due process rights were violated because the facilities' conditions are punitive. Pet. Reply at 13–14.

3.   Balance of Equities and Public Interest

The equities and public interest weigh heavily in Petitioners' favor.  Petitioners face

irreparable injury—to their constitutional rights and to their health.  The potential harm to

Respondent is limited.  Respondent has not identified any specific danger to the public or risk of

flight that would justify Petitioners' confinement in dangerous conditions, *see generally* Resp.

Opp.  In any event, the Court has imposed strict conditions of release that fully address any such

concerns.  *See* ECF Nos. 14–17.  Respondent notes that Ferreyra and Denizard were mandatorily

detained pursuant to 8 U.S.C. § 1226(c).  Resp. Opp. at 4, 5, 8.  However, courts have the

authority to order those held in violation of their due process rights released, notwithstanding

§ 1226(c).  *See Cabral v. Decker*, 331 F. Supp. 3d 255, 259 (S.D.N.Y. 2018) (collecting cases).

As such, Respondent has failed to justify Petitioners' detention in unsafe conditions.

Finally, the public interest favors Petitioners' release.  Petitioners were confined for civil

violations of the immigration laws.  In the current crisis, public health and safety are best served

by rapidly decreasing the number of individuals held in confined, unsafe conditions.  As another

court in this district has observed, "[d]ecreasing the [ICE detention] population will . . . 'mitigate

the damage' to both the [j]ail and the surrounding community and thereby 'reduce the death

toll.'"  *Barbecho*, 2020 WL 1876328, at *7 (quoting *United States v. Nkanga Nkanga*, No. 18 Cr.

713, 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020)).  "Indeed, reducing the size of the

population in jails and prisons reduces the level of risk both for those within those facilities and

for the community at large."  *Id.* (internal quotation marks, citation, and alterations omitted).

Respondent argues that the public interest is disserved by "constitutionalizing" the

Government's response to a public health crisis.  Resp. Opp. at 25.  But the constitutional

requirement that the Government eliminate "a condition of confinement that is sure or very likely

26

to cause serious illness and needless suffering" for those it has chosen to imprison is not a novel one.  *Helling*, 509 U.S. at 33.  When that fundamental obligation is violated, "the public interest lies with the enforcement of the Constitution."  *Ligon v. City of New York*, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013).

Accordingly, the Court holds that Petitioners have established their entitlement to a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure.[12]

IV.    *Mapp v. Reno*

In its decision granting the TRO, the Court concluded that even if Petitioners had not met the requirements for a TRO, the Court would release them on bail pending final resolution of their habeas claims under the Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001).  *Ferreyra*, 2020 WL 1989417, at *12–13.  Respondent has not challenged this holding, *see generally* Resp. Opp., and the Court holds that release under *Mapp*, as explained in the Court's TRO decision, continues to be appropriate at the preliminary injunction stage.

Accordingly, the Court holds, in the alternative to granting Petitioners' motion for a preliminary injunction, that bail is imposed pending final resolution of their petition for habeas corpus.  Their bail conditions shall be the same as the conditions set in the TRO, and extended by the preliminary injunction.

---

[12] Respondent argues that "the purpose of a preliminary injunction is not to give the plaintiff the ultimate relief it seeks."  Resp. Opp. at 25 (quoting *WarnerVision Entm't Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 261 (2d Cir. 1996) (internal quotation marks omitted)).  But the purpose of a preliminary injunction is to "prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits."  *WarnerVision*, 101 F.3d at 261 (internal quotation marks and citation omitted).  The Court has determined that the only way to prevent irreparable harm to Petitioners pending final adjudication of this action is to release them from an unsafe detention facility.

## CONCLUSION

For the reasons stated in this opinion, it is hereby ORDERED that:

1. Petitioners' request for a preliminary injunction is GRANTED as follows:

   a. Petitioners shall remain released, subject to the conditions already set by the Court, and

   b. Respondent is RESTRAINED from arresting Petitioners for civil immigration detention purposes unless Respondent first obtains the Court's permission.[13]

2. The preliminary injunction shall remain in effect until further order of the Court.

   SO ORDERED.

Dated: May 22, 2020
       New York, New York

_____
ANALISA TORRES
United States District Judge

---

[13] Respondent argues that the preliminary injunction should not prohibit Respondent from "taking petitioners back into custody should they commit and further crimes or otherwise violate the terms of [] their release, or from deporting them pursuant to a final order of removal."  Resp. Opp. at 26–27.  Perhaps those occurrences would warrant an application to the Court for a modification of this order.  But the Court shall not pass on the hypothetical circumstances that might allow redetention.